Good morning, Your Honors. Ray Finnegan on behalf of Petitioner Gohar Abrahamyan. This is an asylum matter where today I'm asking the court to overturn an adverse credibility determination made by the Board of Immigration Appeals. This case is a pre-Real ID Act case, which means the asylum application was filed before May 11, 2005. So the more stringent requirements of the Real ID Act do not apply in this matter as it pertains to the credibility analysis. The I-589 was filed June 9, 2002, before the 2005 date. You can see it on Administrative Record, page 259, in the upper right corner. In this matter, my reading shows the Board relying on four factors to sustain the adverse credibility determination that the IJ made. And the first one is how many people of this group called Nadori Front were wearing ---- The first one is her ---- is the birth certificate. That's probably the most important. Yeah. I was going how they were listed, but, yes. The birth certificate, my main argument on that point is the Yemeni Berhe case, where document fraud, if it cannot be attributed to the asylum applicant herself, then it cannot form the basis of an adverse credibility finding. What does that mean in a case like this? It wasn't lodged. It wasn't filed by anybody else. It was procured by somebody else. It was obtained by someone else in a foreign country and given to the asylum applicant, Ms. Abrahamian. So I understand ---- And she filed it, right? And she submitted it to the court, correct. Correct. I don't ---- There's no particular explanation, though. Yeah. There was no explanation, really, one way or the other. How was it ---- Her father ---- her husband had gotten it. Correct. Did you say when he had gotten it? I didn't see that that was talked about. She said he had to pay $500 to send somebody into the country to get it. That's correct. Right. And so there's an inference that the court drew, the immigration court drew from that. Right. Right. And that's why, if you saw my brief, I put in other explanations for why they would be forced to pay $500 other than obtaining a fraudulent document. Do you want to discuss those now? Sure. Sure. Respondents are Armenian ethnically. So she was born in Azerbaijan. There's a conflict between Azerbaijan and Armenia that's well known. And it's quite possible Azeris would want to have Armenians pay more for documents to squeeze them for money, so to speak. See, that's what I couldn't figure out from your brief. Is your position that she had to ---- they were essentially held up and they had to pay a bribe to get this document that normally you'd have to pay probably a very nominal fee? Or was the implication that somebody had to be paid to actually go in the country and get it? I couldn't figure out what you're arguing. I may have missed it. It's not ---- it may be my fault, but can you help clarify, please? Right. Right. Yeah. I was implying that it was a bribe. They had to pay that money at the government office. But wasn't it ---- as I understand the IJ and the BIA's position on this, it's not really a credibility finding. It's that without a valid birth certificate, there isn't evidence to sustain or at least not sufficient evidence to sustain her basic position of that she was an Armenian in Azerbaijan as to who she was. And in other words, whyever it's fraudulent, it's fraudulent. So she therefore doesn't have ---- there's no proof that she was actually an Armenian person living in Azerbaijan, which is what everything hinges on. Right. That's a separate issue, the sufficiency of the evidence as opposed to adverse credibility. But she had another witness come in and testify that she was who she said she was. But that person had known her for three years. Did she have anything else? Right. Not specific on the born in Azerbaijan that I see other than that witness you mentioned. I was reading the board decision like it was primarily based on the credibility. I think if you overturn the credibility or at least bring it back up into an issue with the board, then sufficiency of evidence could be addressed at that time. Because if the credibility can't be sustained, then I don't believe the board's decision could be And I would address the sufficiency of evidence at that point if possible. As mentioned in the Zahidi case, fraud findings, if ambiguous, they must be overturned. And also, like if in that case, they had a fraudulent document analysis or report generated that was ambiguous. It said it may be fraudulent, it may not be fraudulent. It wasn't ambiguous. Right. Correct. So what is the point? I understand that you're arguing. Well, I guess what I'm saying is if – I was trying to go back to answer the question you raised about the sufficiency of evidence. If the credibility is – if it can't be pinned on this asylum applicant per the Yemeni-Berhe decision in that analysis, then it is ambiguous, I guess is what I was getting at. But the finding itself, you're right, was not ambiguous on the report. The declaration needed from the respondent's husband, I don't believe in a pre-Real ID Act case. It's absolutely necessary. And also, I've been fighting this issue in a lot of asylum cases where I believe family declarations are – they're so self-serving. I don't know how a judge would give it significant weight anyway, so I don't know why the BIA is requiring family declarations, but they seem to be doing it most of the time. But I would argue it's not necessary, especially in a pre-Real ID Act case. It's too self-serving. I don't know why they're requiring it. When was she first put on notice that the government was going to take the position that the birth certificate was fraudulent? I think it was March 2006, and then the case was continued to May 22, 2006. So what I'm trying to get at, if you could help me, I'm trying to get at whether or not she had an opportunity to get a declaration from her husband after the time she realized there was this allegation of a fraudulent document. I guess that's what I'm getting at. If you look at the dates, the case March 9, 2006 to May 22, 2006. So she had a couple months, but not a long time. And I'm not clear if it was mentioned to her that she had to do that. I didn't see that in the record. And I think that's a requirement, that, you know, an applicant has to be put on notice that certain documents will be required. If not produced, then it will support an adverse credibility finding. So I don't think she was put on notice. I don't think the time was sufficient. I believe the uniform issue is a minor issue. It doesn't go to the heart of the asylum claim. How many people were in uniforms I'm talking about from the attackers? And then the last issue that the board hinged its adverse credibility finding on was the, the, the, that she was beaten with sticks and metal clubs. But if you look at the record on page 194, 195, she tries to explain that. And she's asked about, you know, why is her written declaration different than her, than her statements in court. And she states that the written declaration is incorrect in terms of metal cables, that it was just rubber clubs. But, you know, with that explanation, I think by itself that cannot sustain an adverse credibility finding. If I can, may I save my time for rebuttal argument? Kennedy, what did her, what did her friend who testified, the person she'd known, whatever it was, three or four years, what was the basis for her testimony? The basis is that she was a mixed ethnic person, half Azeri, half Armenian. And that she was born in the capital of Azerbaijan, Baku. And that this person knew the person for three years, so they knew that she was a mixed ethnicity. I knew that one, sorry? That she was, that she knew the petitioner in this case was a mixed ethnic person, part Azeri, part Armenian. But what about her speech or her accent or was there anything about, about the way she spoke and? Right, right. I didn't, that should have been addressed in the trial. I guess there's no doubt that she was Armenian. The question was, was she an Armenian who had lived in Azerbaijan? Yes. Her family's now in Moscow. Right. Right. Right. Right. Okay. I guess that's it. May I set my time? If there's any left. Okay. We'll. May it please the Court. David Whatmore for the Attorney General. I, I believe Your Honors have hit upon the major point in this case, which is there's simply no proof that this individual is, in fact, an Armenian. Counsel, I have a question. She said she was. She said she was. Yes. She said she was. Because that's proof. That's proof. Counsel, I have a question about, from the get-go. My understanding, and truly may be wrong, we've had, I don't know, 30 cases this week, so feel free to correct me. But my understanding is that this woman filled out an application, not in English, in handwriting. And then she had her husband's friend translate it into English.     Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. You summarize the individual, when she signed her application and only provided the authorization to write it in Word and not the original document? Right, she did not file that. Okay. So then we get to this point of, as you said, credibility becomes very critical in this case. And the immigration court was concerned that there were discrepancies between her testimony and her application. But, of course, they didn't have her application. They had somebody's translation of her application. And I'm concerned about the place in the record where there was a the government asked to have the court decide the case based upon that translation rather than her original document. Well, Your Honor, it's the alien's burden to submit all that she would want to submit. She chose not to submit that untranslated version. Well, the government objected, actually. And that's in the record at 200 and 199. The government said it was concerned that if she was allowed to submit the original application, the one in her native language, it might be in accord with her testimony. Now, I've summarized, I've paraphrased what happened in the record. But why would the government take that position, counsel? Well, I believe if you look about 25 pages earlier in the record, she was being questioned regarding the, I guess, authenticity of the translation. And she stated she read it again and we made sure it's correct. That's at page 174. And then on that same page, she was asked, it was translated back to you and it's accurate, right? And she responded, correct. Counsel, my question has to do with the government's position. Why would the government object to the notion of getting the original document? That's what happened here. Yeah. I can't speak to why they would object to that other than she's assured the court that the translated version is correct and it's inconsistent. And if the only inconsistencies were between the written statement and her testimony, and they weren't also internally inconsistent, major internal inconsistencies, as well as a falsified document that she conceded that she suspected may have been fraudulent that she submitted, when you take all of that, the adverse credibility finding is amply supported by substantial evidence. So you don't have an explanation for why the government would oppose her filing her original application? That's what I'm hearing you tell me. No, I don't have an explanation for that other than the fact that she said it was accurate. Well, it sort of begs the question, because there's this translation problem in this hearing which is also disturbing. The translator had to ask to use a dictionary because she didn't understand some of the words. And we're really trying to get at the truth here, so, and to make sure the evidence was sufficient, that she had a fair shot. So it's concerning. We don't often have translators in these hearings that need to use dictionaries. Personally, I've seen it a lot, a number of times. That's not reassuring, so. You know, and I think some of the translation errors didn't go to the major inconsistencies. There was some regarding whether it was a rubber stick or a metal stick. But it goes straight to one of the major inconsistencies about whether she was hit with a stick or a club or what it was that she was hit with. And that's one of the ones the Court relied upon below. Well, that was part of it, Your Honor. And then the more disturbing inconsistency was her statement indicated that she was whipped with a metal cable. And when she was asked point blank, were you whipped with a metal cable, because she didn't mention it on her direct testimony, her response was, they hit me with or her statement in her written statement was, they hit me with clubs and whipped me with a metal cable. And on cross-examination, she said, no, they never hit me with a, whipped me with a metal cable. The record doesn't support this argument for you. That's not exactly how it played out when one reads the transcript. Well, we would posit that there's numerous inconsistencies throughout. But I think the bigger and more disturbing issue is the birth certificate. The birth certificate clearly is false on its face. It was, it purports to have been issued on June 24th, 1996. Now, the Petitioner indicated that she had moved out of Azerbaijan in 1995. So there would be no reason why this document had been created a year later. And she also indicated that she, well, she didn't enter the United States until 2001, and her testimony was that she asked her husband to procure this document at some point after 2001. So simply looking at it and saying, wow, we have a document that's dated 1996, she's not in the country, she's off in, according to her, Ukraine, at that time, she should look at this document and say, wow, this does not have any indicia of credibility. It's clearly false. She submitted it nonetheless. When asked about it, said, would it surprise you to learn the government's forensic lab determined that the document was a counterfeit? Her response? Could you forgive me for interrupting? Was that in March? That was at page 181. Yeah, it was the latter hearing, Your Honor. The last hearing, or? I believe it was at, well. Well, is it March or May? Can you, do you know? I can check. Our court's indulgent at this moment. Okay. It sounds to me like you're describing the first instance when she was given notice of this. Is that right? Would it surprise you? It was the March 9th hearing, and the document was. That's not the latter hearing, right? That's the earlier hearing. Right. It's, yes, that's the, well, the first hearing, there's the May 22nd of 2006 hearing, and then the March 9th hearing. And the document. Isn't it March 9th, 06, so that comes first, or is it March 9th, 07? It's March 9th, 06, and then there was an earlier May 06 hearing as well. And the document. So May comes after March. And you're. No, no, this is, this is the, I'm sorry. You're confusing me. I am, I am, I apologize, Your Honor. Or I'm confusing myself. But which one came first? Let's see. This was the May hearing. It was 180, well, let me double check this. Okay. This took place in the March hearing is when she was asked, at page 181? March of 06. Yes. All right. Thank you, counsel. Yes. And her response was, no, it wouldn't surprise me, but what I know is that I legally had my registration, and as far as this is fake or genuine, I don't know. And when we look at the Yemeni Berry decision, that decision was really premised on three grounds. The first was that it was, the story was corroborated by other evidence. It was, it involved a submission of a document that was found to be false by the sister of the applicant. There was other evidence that corroborated the testimony. She had letters from family. She had other documents corroborating her story. There was also nothing in the record that suggested that she wasn't credible. Here we have multiple inconsistencies throughout her story. She essentially told three different versions of her story between her statement, her direct testimony, and her testimony on the cross. The details were essentially how, what was she hit with and whether her kids were in or out of the car. Was that basically it?  We had the uniform inconsistency between the statement and the testimony, whether there were all 15 individuals wearing these uniforms or, in her statement, she said only two were at the house. We have the testimony that she stayed in the car while this went on. Then on cross-examination, she embellished and said, oh no, they dragged me out of the car and forced me to wait outside. And then in the statement, she said she waited in a bus, which is inconsistent with her testimony that she's, in fact, in a car. And then with regard to the airport beating, we have the metal cable inconsistency as well as the inconsistency which she was asked if there's anything else that happened to you. She testified that her husband was struck and she said, no, there wasn't. And she was told, well, in your statement, you said you were punched in the face. And then her response was, oh, yes, that happened. I just forgot to mention it. Well, but counsel, that's again a place where you mentioned that earlier, where when you really read the transcript in its entirety, she described this beating. And then they said, has anything else happened to you? And she said, no, what else could they have done to us? They beat my husband so hard, they hit him on his back. We were standing and waiting with these other Armenians. And so in context, her response sounds like she's saying, isn't that enough for you? They've beaten us with these objects. And so I don't think this is your strongest argument. And then we also have a major inconsistency with regard to the day on which she allegedly departed the airport. In her statement, she said, the following day, Soviet soldiers put us on helicopters. She testified that we stayed there for a day. The next day, we were sent to Karabakh. And then on cross-examination, she insisted it actually happened in the same day. I mean, this is a fairly simple question. Scalia, so why is that such a big deal? That in itself wouldn't be a big deal, Your Honor. But for all of these other falsified documents? How long after she departed Russia was she asked this question? How long? What was the time difference? I'm not following your question.  When did she leave the country? Well, that's what she was being asked. And she said, both in her statement and on direct examination, that she was made to wait in the airport, and then the next day she was taken away to the airport. But I want to know what the lapse of time was between this statement and her testimony. Wasn't it 16 years? Oh, when the events actually occurred? Yeah. Yeah, the events occurred allegedly at some point in around, what, 1990, and she was testifying. You know, again, it's not multiple instances over a long period of time. These are a series of incidents that allegedly took place over 24 to 48 hours. And she's being asked to simply recount it. And each time she recounts it, there are numerous inconsistencies throughout. She's essentially telling her story three different ways each time she's asked. And then when she's the only evidence she has submitted for this. You know, this is just a side comment, but listening to you say this, I've always wondered what the premise was underlying the notion that if you have relatively small inconsistencies which these were in telling your story, that proves you were lying as opposed to proving you have a bad memory. I mean, you either have a bad memory in memorizing your story or you have a bad memory in remembering things. And why it proves one rather than the other, I've never understood. Well, when it's coupled with obvious fraudulent documents, she submitted to prove her very identity. But she has a very, I mean, an unusually specific and somewhat elaborate explanation for this, which is that she wasn't, that her case was being held up for years, for lack of a birth certificate, a document, as I understand it. I couldn't go to Azerbaijan. Nobody could go to Azerbaijan. And my husband found some guy who said he could get the document. And I don't even know if it's a bribe. It appears that she had to pay him because he was going to go to some trouble to get this document from Azerbaijan when my husband believed that he could do it because essentially we had no choice. And that's why when they said to her, what a surprise to learn this is fraudulent, she basically said, no, we got it from a stranger because we were under duress. And we did the best we could. That's what she's saying. That's her story. And if it was supported by the evidence, it could possibly be convincing. But if we look at the other one, she gave you a good honest answer there that certainly didn't help her. Well, I mean, it's clearly conflicted with the Department of State country report that's in the evidence. No, it's not conflicted. It's completely consistent. Yeah, I mean, at page 243, they indicate that it was the policy and that Armenians could travel freely throughout Azerbaijan, that that was state policy. There's no evidence that she was banned from the country. There's no evidence that any sort of ethnic cleansing program ever went on in that country or that, you know, the mass roundup of, you know, Azeri Armenians took place and that they were put into this disputed region. There's simply nothing in the evidence to remotely support that any of this sort of behavior occurred. There were, there is evidence in that country report about some displaced individuals, but those displaced individuals were individuals that were living in the disputed region, not individuals that were in Baku that were somehow rounded up and forced into the disputed region on the border of Armenia. There's simply nothing to corroborate her evidence other than her very inconsistent testimony and her false birth certificate. Yeah, and, but we also know that throughout history, the Armenians have been kicked around back and forth between these countries. They've been slaughtered by the Turks. They've been kicked around by the Russians, wherever they went. So. Well, I think from a general historical perspective, yes, I think they had been a historically wronged group. But in this case, looking at whether there's any support in the record for her tale of being forcibly expelled from Baku and then forced to live in this disputed region and then not being able to, A, not knowing anybody back in Azerbaijan where she could simply ask a church member. I mean, she'd lived there for over 30 years in Baku. Did either the BIA or the IJ rely on this State Department evidence? It was mentioned and discussed, but as far as a specific finding during the hearing, it was brought up. I saw it in the opinions. Yeah, in the decision, it's briefly mentioned, but as far as her story conflicting with it, it's not discussed in detail. But yeah, I mean, when we look at it, when we look at her story, there's no support for this type of behavior occurring in the country during the time period she claimed. In fact, when she claims she moved, it was actually one year after the ceasefire had taken place in that region. And the document, the birth certificate, it's false on its face. She conceded that it probably was a fake, yet she submitted it nonetheless. She has no explanation as to why she couldn't contact anyone back in Azerbaijan that she may or may not have known. Then her testimony is an ever-evolving sort of web of, you know, differences. And even if a few of them were based on a translation error, many of them were just simply internally inconsistent. And we would posit that that is more than substantial evidence to affirm the adverse credibility finding in denial of asylum and withholding of a motive. Well, the person that acted as the interpreter, where did that person go? Was he an Armenian? Yeah. I believe it was the ---- Did he live abroad? Did he grow up abroad? I'm not sure of the individual's background. This is an individual that she chose, and it's apparently the husband of one of her girlfriend's, at page 173, she identified him as that. And then she talks about how it was read back to her and it was correct. And she was asked again, it was translated back to you and it's accurate, right? She said, correct. All right. And here's the problem. I don't mean to belabor the point, but if I'm missing something, I sure want you to tell me. Because later in the transcript, they ask her about, I think it was the court. I'm not sure I'm right about that. Asked about the statement in her declaration that said, quote, they hit me with clubs and whipped me with a metal cable. And that's the point. So later, after she said, yeah, this is my statement, the interpreter inquired, quote, may the interpreter ask what club means, close quote, and then looks up the definition, okay? And then after that exchange, the petitioner said, quote, I meant and I said the wooden sticks. I don't know if the person misunderstood me or misinterpreted. When she's saying the person, I think that's the husband of the friend, right? It wasn't clear whether that was the translator mistaking what the words she used for club or if it was the individual who translated the written statement. Right. So at that point, we have two layers of translation that, you know, I find concerning. And hence my question about why the government would have objected at this point, about this point in the transcript, just a few pages later, to having her original handwritten document produced. Well, she was asked about it in the transcript and she said, well, where is it? And she said, well, it could be at home. I may have thrown it out. I don't know what happened to it. Oh, she said she may have thrown it out. Yes, that is in the record. I beg the Court's indulgence to look it up. She does talk about where it was and I'm. That's all right. That's all right. I've got. Okay. I'll find it. I appreciate your clarification. Yeah, I believe she indicated she had no idea where it was. She thought it was in her house and she indicated, I believe, and I. I'll find it. Okay. Is there anything further, Your Honors? If not, we will submit. Thank you. Thank you. It will be like John Paul Jones, don't give up the ship. Right, right, right, right. Thank you, sir. Yeah, I wanted to just point out a couple of points. Primarily, the one that counsel was alluding to with the State Department report, page 243. I would point to the exact same page and argue it supports our position, not counsel's position. It starts at the bottom of record 242 about internally displaced persons. They call them IDPs. And it states there were approximately 575,000 IDPs in the country, meaning Azerbaijan. The vast majority of these persons fled their homes between 1988 and 1993 as a result of the Nagorno-Karabakh conflict. So there's definitely support in the record that there is people are being displaced. But his argument was that there isn't any account of people being rounded up in the way that she described. Is there anything in the country report that supports that? Yeah, let me take this. Back to people fleeing. Right, right. It just says they're being mistreated, forced to pay bribes, having a very hard time. And my argument is they're displaced out of their homes. You know, whether, maybe, you know, I doubt 575,000 people were rounded up, obviously. But it's quite possible that a few dozen were and things like that. So I believe it shows that there's definitely people are being forced out of their home, one way or the other. Also, I wanted to emphasize the point that Justice brought up about the club and the translation. I noticed on page 192 and 193 of the record that there was a problem with the interpreter not understanding the word for club and what it meant. And that's concerning if that's one of the main reasons for the – that they hung their hat on for the adverse credibility. And on all those basis, I extend it to the Court that the case should be remanded. Thank you. All right. Thank you. The matter is submitted, and we'll go on to the next item on the calendar. And I think the lawyer is trying to get your attention. The government's lawyer is trying to get your attention. Oh. Your Honor, I've located the page on which – What did you say? I've located the page on which Judge Chris – Judge Chris – Oh, yeah, sure. We're glad to have your help. Thank you, Your Honor. It's on page 173 of the transcript. She's asked, do you have the original copy? She says, with me. The government says, anywhere. She answers, I gave it to you. I don't know. I might have it at home because it was translated. Either I just threw it away, or I don't know.  Thank you, Your Honors. All right. Thank you. And the matter is resubmitted, and we'll go to item number two, Felice v. County of Orange.
judges: Pregerson, Berzon, Christen